UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

SHANNON CONLEY, Guardian Ad Litem,        Case No. 6:22-cv-01144-MTK
for EAMOON KERR-DALY an individual

           Plaintiff,                        **OPINION AND**
                                           **ORDER**

      v.

CITY OF EUGENE, *et al.*,

           Defendants.

_____

**KASUBHAI,** United States District Judge:

      Following the arrest of Eamonn Kerr-Daly ("Eamonn"), Plaintiff Shannon Conley (the

Guaridan Ad Litem for Eamonn) filed this lawsuit bringing claims for excessive force, disability

discrimination, battery, negligence, and abuse of a vulnerable person. Defendants are the City of

Eugene ("City") as well as Eugene Police Department ("EPD") officers Sergeant Craig Wright

and Lieutenant Chuck Salsbury.[1] Before the Court is Defendants' Motion for Summary

---

[1] Defendants' counsel certified that, when conferring on the present motion, Plaintiff's counsel
agreed to dismiss the individual Defendants except Wright and Salsbury. The Court construes
this as a voluntary notice of dismissal under Fed. R. Civ. P. 41(a)(1)(A)(ii) and dismisses
Defendants David Potter, Jose Alvarez, John Jensen, Margaret Mueth, Andrew Roberts, and
Brandon Rathje.

Judgment. Defs.' Mot. Summ. J. ("Defs.' Mot."), ECF No. 45. Defendants' Motion is granted in part and denied in part.

## BACKGROUND

This case arises out of Eamonn's arrest following a dispute with his parents. Eamonn has schizoaffective disorder and is unable to care for himself given that he experiences auditory hallucinations and paranoid delusions. Daly Decl. ¶ 3, ECF No. 61.

On August 6, 2020, Eamonn was experiencing a mental health crisis in which he picked up a kitchen knife, held it up to his father Paul Daly ("Paul"), and told Paul to leave the house. *Id.* ¶ 5. Eamonn's mother, Sarah Kerr-Daly ("Sarah"), called non-emergency services and explained that Eamonn had pointed a kitchen knife at Paul and told him to get out of the house. Reynolds Decl. Ex. 1 at 00:24-00:48, ECF No. 51-1. Sarah explained that Eamonn had schizoaffective disorder, and she requested help from CAHOOTS[2] and not the police. *Id.* at 00:13-00:35. The dispatcher agreed with Sarah, that Eamonn needed to go to the hospital, but explained that the police needed to make sure that the scene was safe before letting CAHOOTS manage Eamonn. *Id.* at 01:52-01:56, 00:57-01:06. When asked to describe the knife, Sarah told the dispatcher "I'm holding it now, he put it back down . . . I have it on me." *Id.* at 2:58-3:10. The dispatcher told Eamonn's parents that the police would be there, talk him out, and get him to the hospital. *Id.* at 07:22-07:59.

Approximately ten Eugene Police Officers and CAHOOTS arrived at the house. The responding officers were aware that Eamonn had schizoaffective disorder, he was experiencing a

---

[2] "CAHOOTS" stands for Crisis Assistance Helping Out On The Streets and is a mobile crisis and medic response unit funded by the police department, but staffed by a community health provider. Wright Decl. ¶ 5, ECF No. 50. It provides mobile social services, crisis counseling, and non-emergency medical transport to the intoxicated or mentally ill, thereby relieving police from tasks better suited to others. Id.

mental health crisis, his parents wanted CAHOOTS to help Eamonn rather than police, and his parents wanted Eamonn to be taken to the hospital for medical treatment. Morrow Decl. Ex. 1 ("Wright's Bodycam") at 19:50:10-19:50:35, 19:56:05-19:57:20, ECF No. 53-1; Morrow Decl. Ex. 4 at 20:04:25-20:05:25, ECF. No. 53-4. The first officer to arrive on the scene, who also assumed command of the police response, was Sergeant Wright. Sarah informed Wright that Eamonn had prior negative and traumatizing interactions with the police and a positive working relationship with CAHOOTS. Wright's Bodycam at 19:56:05-19:57:20. Sarah explained to Wright that Eamonn was nude and sitting on the living room couch and when she asked him to get dressed, Eamonn became agitated. *Id.* at 19:52:46-19:53:36. Paul explained that Eamonn picked up a kitchen knife, held it up towards Paul, and started yelling, "get out of my house." *Id.* at 19:52:46-19:54:26. Paul explained that Eamon did not make any moves with the knife and was just holding it steady walking towards Paul while Paul backed up slowly. *Id.* Paul did not appear distraught when explaining the incident. Sarah told Wright that Eamonn was "not holding the weapon now." *Id.* at 19:50:47-48. In response to Paul's explanation of the incident, Wright asked Paul "so you're downplaying it now, were you scared at all?" To which Paul responded, "No. But I was thinking how I would maneuver." *Id.* at 19:54:26-19:54:35. Paul then explained that Eamonn had never done anything like this before. *Id.* at 19:54:26-19:54:54. 925

Sarah told Wright that CAHOOTS knew Eamonn very well, and Wright responded that once it was safe to do so, CAHOOTS would come up and talk to Eamonn. *Id.* at 19:58:25-19:58:38. Wright then radioed "PC for menacing APA" and instructed CAHOOTS to go down the street and directed Sarah and Paul to go to CAHOOTS and talk to them. *Id.* at 19:58:52-19:59:11, 20:00:29-20:00:49. Wright went to ask Sarah for her consent to enter the house if necessary, however, Sarah was in the middle of explaining the situation to another officer on the

scene so Wright walked out of earshot and radioed, "when she takes a breath will you ask her for permission to go in if we need to?" *Id.* at 20:03:31-35. A few minutes later, Wright told another officer "I'm leaving CAHOOTS here to manage parents but neither of them know yet." *Id.* at 20:09:52-20:09:59. He then made dismissive comments about CAHOOTS' attempt to stage near the house. *Id.* at 20:09:58-20:10:08.

At around 8:10 p.m., multiple officers began surrounding the house with Eamonn inside. *Id.* at 20:11:20-20:13:00. Officer Alvarez yelled from the yard asking Eamonn to come out and talk with the officers, with his hands open and empty, and that the police would not go away until he talked with them. *Id.* at 20:11:35-20:21:07. About ten minutes later, Eamonn came out to the side of the house standing behind a fence. Morrow Decl. Ex. 5 ("Alvarez Bodycam") at 20:21:05-20:21:51, ECF No. 53-5. Alvarez asked Eamonn if he had any weapons, and Eamonn responded "no" and then proceeded to state non-sensical responses. *Id.* at 20:21:51-20:22:41. Alvarez then told Eamonn he was under arrest and not free to leave. *Id.* at 20:22:29-20:22:45. Alvarez asked if Eamonn understood, and Eamonn responded, "No, I don't think so." *Id.* at 20:22:37-20:22:41. Eamonn appeared calm, he was not yelling, cursing, or screaming, and was not directly threatening anyone. Albies Decl. Ex. 28 ("Wright Dep.") at 80:7-11, 89:21-90:11, ECF No. 63-23; Albies Decl. Ex. 21 ("Alvarez Dep.") at 98:16-99:162-23. Eamonn then went back into the house.

The officers then deliberated for several minutes on how to proceed. At around 8:40 p.m. they decided to quietly approach the house, crack open the front door, and throw a phone inside on speaker mode to facilitate communications with Eamonn. Wright opened the front door and threw in a phone. The officers told Eamonn that he could talk to them through the phone and that he did not need to come out and did not need to pick up the phone. Wright's Bodycam at

20:41:36-20:41:46. Eamonn responded "I have no issues." *Id.* at 20:41:46. Seconds later, Wright

told the other officers "I can see him, he's laying on the couch, go ahead." *Id.* at 20:41:54-

20:41:57. The officers then entered the house. *Id.* at 20:41:58-20:42:03. Eamonn was lying face-

up on the couch under a blanket, with his arms on top of the blanket. Morrow Decl. Ex. 2

("Salsbury Bodycam") at 20:41:50-20:42:02, ECF No. 53-2. Salsbury asked to see Eamonn's

hands to check for weapons, and Eamonn held up his hands. *Id.* at 20:42:02-20:42:14. Salsbury

then asked Eamonn to take off his blanket, and Eamonn responded "it's important" and, then

took the blanket off and got into a seated position on the couch. *Id.* at 20:42:25-20:42:48.

Alongside Salsbury, Potter approached Eamonn, pointing a rifle directly at him, to which

Eamonn responded without shouting, "No I don't need those things now." *Id.* at 20:42:44-

20:42:44. Eamonn then said "let me just get my shoes on," to which officers responded "fair

enough," "perfect," and "we can do that." *Id.* at 20:42:48-20:42:50.[3] The officers did not ask

Eamonn to put his hands up, to stand up, to stay still, and gave no warning that they were about

to grab Eamonn, arrest him, or use force.

 As Eamonn bent down to grab his shoes, Wright and Salsbury grabbed Eamonn without

warning and a scuffle ensued, knocking over furniture and moving Eamonn to another couch. *Id.*

at 20:42:50-20:43:00. The officers instructed Eamonn to stop resisting but Eamonn continued to

struggle, shouting incoherent statements. Several officers held Eamonn down on the couch,

while Potter and Wright each delivered two or three focused blows with closed fists; Potter

stopping his blows to Eamonn's head after another officer yelled "ok we're good, we're good,

we're good." Wright's Bodycam at 20:42:50-20:43:06. Salsbury then yelled "taser guys! taser,

---

[3] The Court notes that Salsbury's engagement with Eamonn as he entered the house was
respectful, kind, and professional. Salsbury's words and tone communicated genuine concern for
the safety and wellbeing of Eamonn.

taser, taser" and then Wright fired his taser, shooting a pair of dart-like electrodes into Eamonn's right upper chest. *Id.* at 20:43:05-20:43:15. The probes did not attach correctly and were therefore ineffective. Eamonn continued to shout nonsensical statements including "I'm the hill savior," "you have to conquer yourself," "change it, change it," and "Sarah." *Id.* at 20:43:05-20:44:25. The officers were able to gain control within just over one minute in total and they handcuffed Eamonn behind his back. They then applied a leg restraint, and connected the handcuffs to the leg restraint so that Eamonn was forced into a kneeling position with his wrists held close to his ankles, behind his back, often referred to as a hogtied position. *Id.* at 20:44:25-20:45:10.

The officers' focused blows caused Eamonn to bleed from his head and blood splatter was left on a couch cushion. Albies Decl. Ex. 8, ECF No. 62-7; Albies Decl. Ex. 9, ECF No. 62-8. Eamonn remained kneeling and hogtied while a medical responder began evaluating him. He stated, "Let's get this stuff off so that I can get checked correctly." Alvarez Bodycam at 20:48:33-20:48:33. The medics determined that no treatment was necessary. Eamonn stated that he was alright and not hurt while also rambling incoherent statements. While being evaluated, Eamonn explained that he would like to be referred to as "Merrier" to which Alvarez responded, "ok, we can call you that if you're more comfortable with that," to which Eamonn replied, "I would love for you to call me that, that would be helpful." *Id.* at 20:49:03-20:49:13. Alvarez's and Eamonn's conversation continued:

> Alvarez: "we don't want to wrestle with you, we don't want to fight you."
>
> Eamonn: "you don't have to."
>
> Alvarez: "I can see that now, that's good."
>
> Eamonn: "You have to respect authorities"

Alvarez: "I appreciate that."

Eamonn: "It's not a joke."

. . .

Alvarez: "When the time comes, are you going to be willing to walk on your own?"

Eamonn: "Yes."

*Id.* at 20:49:20-20:49:39.

While still hogtied and kneeling, Alvarez read Eamonn his Miranda rights and began questioning him about the incident with the knife. Eamonn repeatedly asked for the leg restraints to be removed, and told the officers that he would walk to the police car. Potter later recorded in his probable cause affidavit that "due to Eamonn's fighting behavior, he was unable to be interviewed." Albies Decl. Ex. 12 at 4, ECF No. 62-11. However, the body camera footage shows that Eamonn responded to the officers' questions without shouting or fighting, but that his answers were nonsensical. Wright's Bodycam at 20:50:45-20:54:20.

After Eamonn told Alvarez that he no longer wanted to explain the underlying incident with the knife, Alvarez waited a moment and then asked Eamonn if he was still willing to talk. Eamonn responded "I just need the leg things off." Alvarez Bodycam at 20:53:17-20:53:19. Alvarez responded, "Well we can work on that but . . . Eamonn, I need a better understanding of what happened here before we can make any agreements about taking the thing off of your legs." *Id.* 20:53:20-20:53:34. Eamonn then began explaining what had happened, however, Alvarez said that he could not understand Eamonn's explanation. Wright then approached Alvarez and said that they could take the leg restraints off so that Eamonn could walk out to the car. Alvarez told Wright that Eamonn had said that he could walk out to the car, "but I would not do that right now." *Id.* at 20:54:00-20:54:20. Wright then gave the command to carry Eamonn hogtied out to

the car. As officers bent down to pick up Eamonn he said, "Let's get the leg things off, remember?" The officers did not respond to his question and carried him out to the car while Eamonn repeatedly asked for the leg restraints to be removed. The officers placed him in the back of the police car on his side, still hogtied. *Id.* at 20:54:00-20:55:30.

After Eamonn was arrested, Alvarez told Paul and Sarah that Eamonn was being arrested and transported to jail. Morrow Decl. Ex. 6 at 21:24:00-21:33:38, ECF No. 53-6. Sarah continued to explain that she wanted Eamonn to receive mental health treatment rather than be sent to jail, as it would only harm him. *Id.*; Morrow Decl. Ex. 3 at 21:04:40-21:10:48. Salsbury told Sarah that their "hands are tied" because state law mandated that Eamonn be arrested for a domestic violence crime. *Id.* at 21:05:30-21:05:55. Eamonn's medical provider was present on the scene and also pleaded with the police to take Eamonn to the hospital rather than jail. *Id.* at 21:04:40-21:10:48.

After two days at the Lane County jail, Eamonn was sent to the emergency department for psychiatric evaluation, where he was placed on a hold and admitted to the Behavioral Health Unit. Morrow Decl. Ex. 13, ECF No. 53-13. His medical record indicates that he had no complaints of pain but a notable abrasion on his forehead. *Id.* The criminal charges against Eamonn were dropped four months later. Albies Decl. Ex. 13, ECF No. 62-12.

Sarah made a formal complaint to the City, alleging that the police officers used excessive force and failed to take Eamonn to the hospital. Albies Decl. Ex. 14, ECF No. 62-13. The City reviewed the police reports and body camera footage and determined that the force the officers used was appropriate, and that the situation was handled consistent with EPD policy and training. Albies Decl. Ex. 15, ECF No. 62-14

**STANDARDS**

**I.     Motion for Summary Judgment**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec. Service, Inc.*, 809 F.2d at 630.

**DISCUSSION**

Plaintiff brings the following claims: Claim One, Fourth Amendment Violation for Excessive Force under 42 U.S.C. § 1983 against Wright and Salsbury for their individual participation and their role as supervisors on the scene; Claim Two, a *Monell* claim against the City for allowing excessive force against people in mental health crisis; Claim Three, Disability

Discrimination under federal and state law against the City; Claim Four, Battery under state law against the City; Claim Five, Abuse of a Vulnerable Person under Or. Rev. Stat. § ("ORS") 124.100(2) against the City; and Claim Six, Negligence under state law against the City. Defendants move for summary judgment on all claims.

## I.    Section 1983 Claims Against Individual Defendants

Defendants move for summary judgment on Plaintiff's First Claim, which alleges that Wright and Salsbury used and directed excessive force in violation of Eamonn's Fourth Amendment rights. Defendants argue that Wright and Salsbury cannot be held liable under a theory of supervisory liability, that the amount of force used was reasonable, and that they are entitled to qualified immunity because the law at the time of the incident does not clearly establish that their conduct was unconstitutional.

### A.    Supervisory Liability

Plaintiff alleges that Salsbury, a lieutenant, and Wright, a sergeant, supervised the other officers on the scene and are liable for directing the circumstances which they knew were likely to lead to an unreasonable use of force or that they failed to intervene.

"An official may be liable as a supervisor only if either (1) he or she was personally involved in the constitutional deprivation, or (2) a sufficient causal connection exists "'between the supervisor's wrongful conduct and the constitutional violation.'" *Felarca v. Birgeneau*, 891 F.3d 809, 819–20 (9th Cir. 2018) (quoting *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011)). "The requisite causal connection can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Starr*, 652 F.3d at 1207–08.

Wright was the first officer on the scene and the evidence shows that he was in command. Described in more detail below, it was Wright's decision to abandon the plan to communicate with Eamonn by phone and to instead enter the house to effect the arrest. As a lieutenant, Salsbury was Wright's superior and could have told the officers not to enter the house. Instead, he took the lead role in communicating with Eamonn as the officers entered the house and approached with guns drawn. While "police officers need not employ the least intrusive degree of force possible[,] . . . the presence of feasible alternatives is a *factor* to include in" an excessive force analysis. *Bryan v. MacPherson*, 630 F.3d 805, 831 n.15 (9th Cir. 2010) (quotation marks omitted). A jury could find that, in giving or acquiescing in the command to enter the house and go hands-on, Wright and Salsbury set in motion a series of acts which they knew or reasonably should have known would likely result in an avoidable use of substantial force on a person in the midst of a mental health crisis. Under such circumstances, a jury could find that Wright and Salbury should have known that a constitutional violation was likely to occur.

**B.    Fourth Amendment Excessive Force**

Defendants argue they are entitled to summary judgment because the amount of force used in effecting the arrest was reasonable under the circumstances. In addition to directing the other officers' into a situation where the use of force was likely, Salsbury and Wright personally participated in the use of force against Eamonn. Wright grabbed, wrestled, punched, and attempted to taser Eamon. Salsbury grabbed, wrestled, and gave the command to taser Eamonn.

"Fourth Amendment excessive force claims are examined under the reasonableness standard and the framework outlined by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989)." *Price v. City of Sutherlin*, 945 F. Supp. 2d 1147, 1155 (D. Or. 2013) (citation omitted).

In evaluating a claim of excessive force, the critical question "is whether the use of force was objectively reasonable in light of the facts and circumstances confronting the . . . officer." *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) (citation and internal quotations omitted). This analysis requires courts to consider (1) the severity of the crime at issue; (2) whether the individual posed an immediate threat to the safety of the officers or others; and (3) whether the individual was actively resisting arrest or attempting to flee. *Graham*, 490 U.S. at 396. The Court must also "look to whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994). Because excessive force claims "almost always turn on . . . credibility determinations" and "nearly always requir[e] a jury to sift through disputed factual contentions," summary judgment is rarely warranted. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (citation and internal quotations omitted).

### 1.    Type and Amount of Force

The first step of the excessive force inquiry is to assess "the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted." *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (internal quotation marks omitted). "Characterizing the amount of a non-lethal force can often depend on specific factual circumstances." *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021). Courts must consider not only the "actual harm" but also "the risk of harm" created by "the type and amount of force used." *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1152 (9th Cir. 2022).

Relevant to this inquiry is whether a reasonable officer on the scene would have appreciated and responded to the risks created by the likelihood that the arrestee will react more adversely to a use of force than ordinarily expected. *Id.* at 1153.

Here, Defendants Wright and Salsbury were aware that Eamonn was experiencing psychosis. Sarah told Wright specifically that Eamonn had traumatic prior interactions with police. At Wright's direction, the officers entered the house and approached Eamonn, some with guns drawn. Eamonn was complying with Salsbury's commands when, without warning, officers Wright and Salsbury forcefully grabbed Eamonn, which immediately triggered an adverse reaction. The officers then attempted to overwhelm Eamonn, which another officer on the scene later described as a "controlled pig pile." Salsbury Bodycam at 20:48:44-20:48:45. During this struggle, Wright and Potter struck Eamonn in the head and body and then Salsbury called for the use of a taser, which Wright fired in dart mode, however, the taser was ineffective because the probes attached incorrectly. Eamonn suffered an abrasion on his head which did not require medical treatment but did leave blood splatter on a couch. The officers then hogtied Eamonn in a forced kneeling position while he was medically examined and then questioned about the incident. Alvarez considered removing the leg restraints if Eamonn explained what had happened with the knife. Eamonn assured the officers that he would walk to the car and he tried to explain what had happened with the knife. Despite his repeated requests to have the leg restraints removed, the officers carried him out of the house and loaded him into a police car.

Take-downs, focused blows to the head, and tasers are each considered a significant, intermediate use of force. *Rice*, 989 F.3d at 1121 ("take-down involved a substantial and aggressive use of force") (internal quotation marks omitted); *Coles v. Eagle*, 704 F.3d 624, 628 (9th Cir. 2012) (blows to the head were a significant use of force); *Bryan*, 630 F.3d at 826 (tasers, "when used in dart-mode constitute an intermediate, significant level of force that must be justified by the governmental interest involved"). Similarly, the use of restraints may constitute a significant use of force under certain circumstances. *Palmer v. Sanderson*, 9 F.3d

1433, 1436 (9th Cir. 1993) (abusive application of handcuffs constituted excessive force); *Blankenhorn*, 485 F.3d at 480 ("use of hobble restraints was excessive under the circumstances").

Here, when describing the amount of force used, Defendants place too much of an emphasis on the fact that Eamonn did not suffer a severe injury and that the taser was ineffective. "[F]orce can be unreasonable even without physical blows or injuries." *Bryan*, 630 F.3d at 824. "Consideration of both the actual harm and the risk of harm is important as the Fourth Amendment is concerned with reasonableness." *Williamson*, 23 F.4th at 1152. Just as [t]here can be situations in which the risk of harm presented is objectively less significant than the actual harm that results[,]" so too there can be situations in which the risk of harm presented is objectively more significant than the actual harm that results. *Id.* at 1153. In either circumstance, the type and amount of force used may be unreasonable if the officer "failed to appreciate the risks presented and act accordingly." *Id.*

Wright's order to enter the house to approach Eamonn, and his decision with Salsbury to grab Eamonn without warning, created a substantial risk of serious harm, making the act of grabbing Eamonn more than a minimal amount of force. A jury could find that a reasonable officer on the scene would have appreciated the likelihood that Eamonn would react more adversely to being confronted and forcefully grabbed than would ordinarily be expected. Grabbing Eamonn without warning, punching him in the head and body, attempting to taser him, and keeping him hog tied after the struggle had subsided each amounted to an "intermediate or medium, though not insignificant, quantum of force" that must be justified by the governmental interest involved. *Rice*, 989 F.3d at 1124 (quoting *Bryan*, 630 F.3d at 826).

2.     Immediate Threat

The "most important" *Graham* factor is whether the individual posed a threat to the safety of the officer or others. *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994). "If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). However, a "simple statement by the officer that he fears for his safety or the safety of others is not enough" to establish a safety threat; rather, "there must be objective factors to justify such a concern." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001). Put differently, while the possibility that an individual has a weapon is a cause for concern, an officer must articulate objective factors that suggest a potential weapon poses a threat. *Compare Miller v. Clark Cnty.*, 340 F.3d 959, 964–65 (9th Cir. 2003), *and Saman v. Robbins*, 173 F.3d 1150, 1156 (9th Cir. 1999), *with Beaver v. City of Fed. Way*, 507 F. Supp. 2d 1137, 1146 n.8 (W.D. Wash. 2007).

Here, the record contains conflicting evidence about the immediacy of the threat that Eamonn posed to the officers and whether an arrest by force was necessary. Defendants' contention that "[b]efore the arrest, the officers engaged in exhaustive efforts to get Eamonn to come out of the house unarmed" remains in dispute. Defs.' Reply at 6, ECF No. 66. While "police officers need not employ the least intrusive degree of force possible[,] . . . the presence of feasible alternatives is a *factor* to include in our analysis." *Bryan* 630 F.3d at 831 n.15 (quotation marks omitted).

When Wright arrived on the scene, one of his first questions to Sarah was whether there was a phone inside the house that they could use to communicate with Eamonn. There was not. Approximately thirty minutes later, the officers executed their plan to open the door and throw a

phone inside the house to facilitate communications with Eamonn. The goal was to convince him to come outside the house and to sit down on the curb. After throwing the phone in the house, the plan was abandoned immediately—not because it proved futile or because the officers were presented with exigent circumstances requiring immediate action—but because Wright could see that Eamonn was lying face-up on the couch with his arms exposed. Drawing all inferences in favor of Plaintiff, Wright gave the command to enter the house, rather than stick to the plan, because Eamonn did not pose an immediate threat. As the officers approached, Eamonn complied with their orders.

Defendants argue that force was necessary because there could have been a knife hidden in the couch. This calls into question whether it was reasonable for the officers to abandon their plan to communicate by phone and to instead enter the house to effect an arrest by force. Whether the officers reasonably believed that Eamonn was within reach of a weapon is also in dispute. Sarah told the police dispatcher "I'm holding [the knife] now, he put it back down . . . I have it on me." And she told Wright, that Eamonn "was not holding the weapon now." Defendants fail to cite to any evidence that the knife was found inside the house following the arrest. Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Eamonn did not pose an immediate threat to the officers. Defendants provide no explanation for why Eamonn remained hogtied after he had calmed down and was answering Alverez's questions.

### 3.    Severity of the Crime

The next factor to consider is the severity of the crime at issue. *See Graham*, 490 U.S. at 396. As with the other *Graham* factors, the scope of this inquiry is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011) (internal citation and quotation omitted).

The Court's inquiry on this factor is an objective test that depends on whether a reasonable officer would have concluded a serious crime was occurring. *See Lowry*, 858 F.3d at 1258. "A mentally ill individual is in need of a doctor, not a jail cell, and in the usual case—where such an individual is neither a threat to himself nor to anyone else—the government's interest in deploying force to detain him is not as substantial as its interest in deploying that force to apprehend a dangerous criminal." *Bryan*, 630 F.3d at 829.

Here, Wright concluded that Eamonn committed a domestic violence crime when he pointed the kitchen knife at Paul and told him to get out of the house. Wright Decl. ¶ 7. Under ORS 133.055, when an officer has probable cause to believe that a person has placed a family member in fear of imminent serious physical injury the officer "shall" make an arrest. "Any form of domestic violence is serious, but the" severity of the underlying criminal conduct and the victim's injury or distress are also relevant. *Thomas v. Dillard*, 818 F.3d 864, 890 (9th Cir. 2016), *as amended* (May 5, 2016). The officers were aware that Sarah called non-emergency services because she believed that her son was experiencing a mental health crisis and needed assistance from CAHOOTS. She did not call to report a crime, and she specifically requested that the police do not respond. The alleged victim, Paul, was not injured and did not appear in distress. He repeatedly rejected the officers' assertions that he must have been scared. While the officers may have had probable cause to make an arrest, the severity of Eamonn's alleged crime remains in dispute.

### 4.    Attempt to Resist or Flee

The final *Graham* factor involves an inquiry into whether Eamonn was resisting or attempting to evade arrest. Before entering the house, Officer Alvarez asked Eamonn if he understood that Eamonn was under arrest and not free to leave. Eamonn responded, "No, I don't

think so." Alvarez Bodycam at 20:22:37-20:22:41. Given Eamonn's mental condition at the time, whether he understood the officers' commands and was actively resisting their instructions remains in dispute. There is no evidence that Eamonn was attempting to flee. As the officers entered the house and approached Eamonn, he complied with Salsbury's commands. Viewed in the light most favorable to Plaintiff, the decision to go hand-on without warning prompted an adverse reflexive response from Eamonn in which he immediately tensed up and a struggle ensued with the officers. During the struggle, Eamonn shouted nonsensical statements such as "I am the hill savior" and "Sarah, you have to conquer yourself." The bodycam footage shows that Eamonn resisted the officers' attempts to restrain him and this factor, although nondeterminative, weighs in favor of the officers' use of force during the struggle to handcuff Eamonn. The bodycam footage shows that after the struggle, although still in the midst of experiencing a mental health crisis, Eamonn was cooperative. Yet, Alvarez kept him hogtied.

Balancing the amount and type of force used against the government's interests tips in favor of a finding that the officers' use of force was unreasonable under the circumstances. With material facts remaining in dispute, the Court cannot rule as a matter of law that the officers' use of force was not excessive.

### C.    Qualified Immunity

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks and citation omitted). The purpose of qualified immunity is to "strike a balance between the competing 'need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when

they perform their duties reasonably.'" *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (quoting *Pearson*, 555 U.S. at 231). Qualified immunity "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231.

"Determining whether officials are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case." *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Here, the Court has already found that Plaintiff has presented sufficient evidence from which a reasonable jury could find that Eamonn's Fourth Amendment rights against excessive use of force were violated. Thus, the first prong of the analysis is satisfied, and the remaining question is whether the rights allegedly violated were clearly established in light of the specific context of the case.

The Supreme Court has emphasized that the asserted right "must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (brackets and internal quotation marks omitted).

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority[.]'" It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that "every reasonable official" would know.

*D.C. v. Wesby*, 583 U.S. 48, 63 (2018) (citations omitted). In other words, while qualified immunity does not require "a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741

(2011). The specificity of the clearly established law is "especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal citation, quotation, and alterations omitted). "A plaintiff "bears the burden of showing that the right at issue was clearly established."" *Emmons v. City of Escondido*, 921 F.3d 1172, 1174 (9th Cir. 2019) (quoting *Alston v. Read*, 663 F.3d 1094, 1098 (9th Cir. 2011)).

Plaintiff fails to meet her burden of showing that the law is clearly established such that every reasonable officer would understand that grabbing Eamonn without warning and wrestling, punching, and attempting to taser him during the struggle to handcuff him amounted to an excessive use of force. The cases identified by Plaintiff are materially distinguishable from the circumstances here. First, Plaintiff relies on *Blankenhorn*, 485 F.3d at 482 for the principle that the officers' use of force may be unreasonable where the plaintiff "was not manipulating his arms in an attempt to avoid being handcuffed." In contrast, here, Eamonn actively resisted the officers' attempt to place him in handcuffs. Next, Plaintiff argues that *Bryan*, 630 F.3d 805 would put every reasonable officer on notice that attempting to taser Eamonn during the struggle to restrain him constituted an excessive use of force. Unlike here, however, the officer in *Bryan* fired the taser *before* a physical struggle had ensued and without warning. *Id.* at 827 ("An unarmed, stationary individual, facing away from an officer at a distance of fifteen to twenty-five feet is far from an 'immediate threat' to that officer."). *Bryan* is therefore materially distinguishable because here, Wright only attempted to deploy the taser after the officers were actively engaged in a struggle and warned Eamonn to stop resisting. Last, Plaintiff cites to *Rice*, 989 F.3d at 1126 to support her argument that there is a clearly established right to be free from

any non-trivial force in the face of passive or even minimal resistance. Unlike here, however, the plaintiff in *Rice* provided evidence that he did not resist the officers' as they pulled him out of the car and attempted to put him in handcuffs. *Id.* at 1117. Plaintiff fails to cite evidence creating a dispute of fact about whether Eamonn's resistance was minimal.

In sum, Plaintiff fails to meet her burden of identifying precedent establishing that the law at the time of the arrest was sufficiently clear such that every reasonable officer under the circumstances would understand that their conduct violated Eamonn's constitutional rights.

## II.     Section 1983 Municipal Liability against the City

Defendants move for summary judgment against Plaintiffs' Second Claim for municipal liability under § 1983 against the City.

In certain circumstances, a municipality may be held liable as a "person" under § 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978). However, "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. Liability only attaches where the municipality itself causes the constitutional violation through the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694; *see also Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992) ("[i]f the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability") (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988)).

There are three methods by which a plaintiff may establish municipal liability under *Monell*. First, a municipality may be liable where the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict[s] the injury." *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 802 (9th Cir. 2018) (quoting *Monell*, 436 U.S. at 694). Second, a municipality can fail to train employees in a manner that amounts to "deliberate indifference" to a constitutional right, such that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [government entity] can reasonably be said to have been deliberately indifferent to the need." *Id.* (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)). Third, a municipality may be held liable if "the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Id.* at 802–03 (quoting *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013)).

Here, Defendants move for summary judgment and argue that there is no evidence in the record showing that the City caused a constitutional violation through an official policy, a training failure, or a policy maker's ratification of a subordinate's unconstitutional conduct. In response, Plaintiff advances two theories of municipal liability: (1) that the city had a policy of taking arrestees in a mental health crisis to jail, rather than to a hospital; and (2) that Chief Skinner, an individual with final policy-making authority, ratified the officers' use of force and decision take Eamonn to jail instead of to a hospital. Regarding the first theory, Plaintiff argues that "[t]o the extent the record is unclear on the City's policies, it is a disputed fact." Pl.'s Resp. at 30. Regarding the second theory, Plaintiff argues that EPD's failure to "consider the ADA and

accommodations in its review of the incident . . . is ratification." Pl.'s Resp. at 31. Absent from Plaintiff's arguments, however, are any citations to evidence in the record creating a dispute of fact. Plaintiff fails to establish that evidence in the record shows a material dispute of fact regarding the City's allegedly unconstitutional policies or ratification of unconstitutional conduct. To the extent Plaintiff relies on the undisputed facts in this record, those facts fail to trigger legal liability. Summary judgment is granted in favor of the City on Plaintiff's *Monell* claim.

### III.    Disability Discrimination Claims

Plaintiff's Third Claim alleges that the City failed to accommodate Eamonn's disability in violation of Title II of the Americans with Disabilities Act ("ADA"), § 504 of the 1973 Rehabilitation Act ("Rehabilitation Act"), and ORS 659A.142. Defendants move for summary judgment, arguing that Plaintiff's allegations are conclusory and unsupported by evidence in the record creating a dispute of fact. The Court disagrees.

Title II of the ADA provides that: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Title II of the ADA was expressly modeled after § 504 of the Rehabilitation Act" and courts routinely address the claims under a single analysis. *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001); *See* 29 U.S.C. § 794. Similarly, ORS 659A.142 prohibits discrimination against people with disabilities and must "be construed to the extent possible in a manner that is consistent with any similar provisions of the federal" ADA. ORS 659A.139(1). The Court proceeds with its

analysis under the ADA which applies to all three statutory prohibitions on disability based discrimination.

To prove disability discrimination under Title II, a plaintiff must establish four elements: (1) they are "an individual with a disability"; (2) they are "otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities"; (3) they were "either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity;" and (4) "such exclusion, denial of benefits, or discrimination was by reason of [his] disability." *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002). The ADA applies to custodial arrests by police agencies. *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014).[4]

Courts have recognized at least two types of Title II claims applicable to arrests: (1) wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity; and (2) reasonable accommodation, where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of the investigation or the arrest, causing the person to suffer greater injury or indignity in that process than other arrestees. *Id.* Here, Plaintiff assert both types of disability discrimination claims.

### A.    Wrongful arrest

"To prevail on a theory of wrongful arrest under the ADA, [a plaintiff] must prove that (1) he was disabled; (2) the officers knew or should have known he was disabled; and (3) the

---

[4] On reply, Defendants abandon their rebutted argument that ORS 659A.142 does not apply to police investigations or arrests. The Court finds that police investigations and arrests fall within the purview of ORS 659A.142(4) because they are services provided by a public body and interpreting the statute otherwise would be inconsistent with the ADA. *Coppedge v. City of Hillsboro*, No. 3:21-CV-00146-YY, 2022 WL 21828133, at *9 (D. Or. Mar. 31, 2022).

officers arrested him because of legal conduct related to his disability." *Lawman v. City & Cnty. of San Francisco*, 159 F. Supp. 3d 1130, 1147 (N.D. Cal. 2016). The officer discriminates against the plaintiff by arresting them because the officer "misperceive[s] the effects of [a] disability as criminal activity." *Sheehan*, 743 F.3d at 1232. For example, a claim for wrongful arrest can arise in this context when officers arrest a person for public intoxication or drunk driving when in fact they were suffering from the effects of a mental health crisis, a stroke, or hypoglycemia. *See, e.g.*, *Lawman*, 159 F. Supp. 3d at 1148–49 (plaintiff was incoherent because he suffered from a mental illness, not because he was intoxicated).

In contrast, a claim for wrongful arrest based on disability discrimination fails as a matter of law where the underlying conduct is unlawful, even if tangentially related to the plaintiff's disability. *Ivchenko v. City of Scottsdale*, No. 20-17463, 2021 WL 4739642, at *1 (9th Cir. Oct. 12, 2021) (unpublished) (affirming district court's dismissal of disability discrimination claim where the plaintiff was arrested for unlawfully making a false report to police while intoxicated, regardless of her alcoholism disability).

Here, the parties do not dispute that the officers knew that Eamonn was a person with a disability and that he raised a knife at Paul during a mental health crisis. Defendants argue that Plaintiff's claim for disability discrimination based on a wrongful arrest fails as a matter of law because the officers had probable cause to arrest Eamonn, even if the underlying conduct occurred because Eamonn was suffering from a mental health crisis.

An officer has probable cause to make an arrest under ORS 133.055(2)(a) when he believes that the arrestee placed the family member in fear of imminent serious physical injury. Plaintiff argues that the officers did not have probable cause to arrest Eamonn for threatening a family member because, prior to making the arrest, Eamonn's father, Paul, told the officers that

he was not scared. "[A]n arrest is permissible so long as there is probable cause 'as to any offense that could be charged under the circumstances.'" *DeVaughn v. Cnty. of Los Angeles*, 824 F. App'x 501, 503 (9th Cir. 2020) (quoting *Blankenhorn*, 485 F.3d at 473). Whether a jury would convict Eamonn for violation of ORS 133.055(2)(a) after hearing evidence that his father was not scared is immaterial. The officers arrived at the scene after receiving a call that Eamonn had raised a knife towards a family member. Eamonn refused to comply with the officers' lawful orders to come out of the house. Plaintiff's disability claim based on a wrongful arrest theory fails because Eamonn was not arrested for lawful conduct after an officer misperceived the effects of his disability as criminal activity.

### B. Reasonable Accommodation

To prove a disability discrimination claim under a theory of failure to accommodate, the plaintiff must show that, "although police properly investigate[d] and arrest[ed] a person with a disability for unlawful conduct, they fail[ed] to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity than other arrestees." *Sheehan*, 743 F.3d at 1232.

The plaintiff bears the initial burden of producing evidence of the existence of a reasonable accommodation. *See Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002). The reasonableness of an accommodation is ordinarily a question of fact, *see U.S. E.E.O.C. v. UPS Supply Chain Sols.*, 620 F.3d 1103, 1110 (9th Cir. 2010). "A public entity may defeat a reasonable accommodation claim by showing 'that making the modifications would fundamentally alter the nature of the service, program, or activity.'" *Sheehan*, 743 F.3d at 1233 (quoting 28 C.F.R. § 35.130(b)(7)).

Plaintiff argues that even if EPD had probable cause to arrest Eamonn, they failed to provide a reasonable accommodation for his disability when they chose to escalate the situation

by confronting him in the house to effect the arrest.[5] Plaintiff asserts that Defendants could have reasonably accommodated Eamonn by allowing him to speak with CAHOOTS, rather than forcing a confrontation inside the house. Defendants argue that they provided accommodations interviewing Eamonn's parents about what his triggers were and by attempting to coax Eamonn to come out of the house for approximately forty minutes before entering.

Defendants make three arguments for why these accommodations were reasonable, none of which the Court finds persuasive. Defendants' first argument is that the officers provided reasonable accommodations when effecting the arrest because the amount of force that they used was also reasonable. This argument relies on a threshold finding that the officers' use of force was reasonable, which the Court cannot find because material facts remain in dispute. Defendants' second argument is that Plaintiff offers no evidence other than speculation on whether waiting longer would have resulted in a better outcome than what occurred. However, in *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1233 (9th Cir. 2014), the Ninth Circuit found that the plaintiff's "assert[ion]" about what the "officers should have" done to accommodate her disability was sufficient to survive summary judgment. Plaintiff's speculations here are consistent with those in *Sheehan* in that they are based on reasonable assertions. The record contains evidence from which a jury could find that it was unreasonable for the officers to immediately abandon the plan to communicate with Eamonn by phone and to instead confront him in the house when they knew that Eamonn was experiencing psychosis, had a negative

---

[5] Plaintiff also argues that Defendants failed to reasonably accommodate Eamonn's disability by taking him to jail rather than to a hospital. However, Plaintiff fails to provide evidence that the jail failed to provide adequate services for his disability or that Eamonn suffered an injury or indignity while in jail that he would not have but for his disability.

history of police interactions, and that CAHOOTS had a working relationship with Eamonn and was ready to respond.

Last, Defendants argue that because Defendants present evidence that the officers reasonably accommodated Eamonn's disability in effecting the arrest, the burden shifts to Plaintiff to show that the officers' chosen accommodations were unreasonable. Defs.' Reply at 15, ECF No. 66 (citing *Moore v. City of Berkeley*, No. 14-CV-00669-CRB, 2018 WL 1456628, at *12 (N.D. Cal. Mar. 23, 2018), *aff'd,* 801 F. App'x 480 (9th Cir. 2020)). The case on which Defendants rely is distinguishable. In *Moore*, the court granted the city summary judgment on the plaintiff's ADA claim because the plaintiff provided "no evidence from which a reasonable juror could find that there was anything officers could have done to make Ms. Moore calm down." *Moore*, 2018 WL 1456628, at *12. In contrast, here, the record contains evidence from which a reasonable jury could find that the officers could have reasonably accommodated Eamonn's disability by allowing him to speak with CAHOOTS before entering the house to confront him.

### C.    Monetary Relief

Monetary relief under the ADA requires a showing that the officers acted with deliberate indifference. *Duvall*, 260 F.3d at 1138. Viewed in the light most favorable to Plaintiff, the officers knew that Eamonn was experiencing psychosis, that he had a negative history of interactions with the police, and that CAHOOTS had a working relationship with Eamonn and was ready to facilitate Eamonn's custody without confrontation. A reasonable jury could conclude that the officers acted with deliberate indifference when they decided to immediately abandon their chosen accommodation of placing a phone on speak mode inside the door to facilitate communications with Eamonn or when they decided to confront him in the house with weapons drawn and grab him without warning.

Defendants are not entitled to summary judgment on Plaintiff's disability discrimination claims.

## IV.    Tort Claims

Plaintiff alleges tort claims against the City for battery, abuse of a vulnerable person, and negligence. Defendants argue that they are immune from civil liability because the officers acter in good faith, that Eamonn did not suffer a qualifying injury to obtain relief for a claim of abuse of a vulnerable person, and that Plaintiff's negligence claim cannot be premised on the same set of facts as the excessive force claim.[6]

### A.    State Law Immunity

Defendants first argue that the City is immune from civil liability for the officers' decision to arrest Eamonn for a violation of ORS 133.055.

Under ORS 133.055, when an officer has probable cause to believe that a person has placed a family member in fear of imminent serious physical injury the officer "shall" make an arrest. If an "officer acts in good faith and without malice," he is immune from civil liability for his decision to make the arrest. ORS 133.315(1). Similarly, the Oregon Tort Claims Act grants immunity from civil liability for an officer's mistaken decision to make an arrest unless the officer acted "in bad faith or with malice." ORS 30.265(6)(f). The parties agree that if immunity attaches, it attaches only to the officers' decision to make the arrest, and not to the how the officers carried out the arrest. Pl.'s Resp at 32-33; Defs.' Reply at 20.

Plaintiff argues that there is evidence from which a jury could conclude that the officers' decision to arrest Eamonn was not made in good faith. For example, Sarah called non-emergency

---

[6] Defendants also argue that Plaintiff's claims for battery, negligence, and abuse of a vulnerable person fail because the officers' use of force was reasonable. For the reasons explained above, a jury must decide whether the officers' use of force was reasonable. Defendants' basis for summary judgment on the battery claim therefore fails.

services because her son was experiencing a mental health crisis, she sought the assistance of

CAHOOTS, and she requested that police do not respond. Wright responded to *that* call but

made statements to other officers on the scene that CAHOOTS was there to "manage parents"

but that "neither of them know yet." *Id.* at 20:09:52-20:09:59. Evidence in the record could show

that officers repeatedly attempted to get Paul to endorse the idea that Eamonn had placed him "in

fear of imminent serious physical injury" and that they intentionally discredited Paul's express

statement that Eamonn's conduct had not scared him because the officers were determined to

make an arrest. *See e.g.* Wright's Bodycam at 19:54:26-19:54:54. (Wright asking Paul if he was

scared and Paul responding "no."). Whether it was reasonable for Wright to believe that Eamonn

had put Paul in fear of imminent serious physical injury is distinct from whether Wright's

decision to arrest Eamonn was made in bad faith. A decision can be both unreasonable and

without malice. Although the record contains evidence showing that Paul and Sarah did not

believe that a crime had occurred, there is no evidence showing that Wright or the other officers

did not believe that a crime had occurred and decided to arrest Eamonn regardless. The City is

immune from liability for the officers' decision to make an arrest. However, how the officers

carried out the arrest and their conduct after the arrest remain viable theories of liability.

### B.      Abuse of a Vulnerable Person

Defendants argue that Plaintiff's fifth claim for the abuse of a vulnerable person should

be dismissed because Eamonn did not suffer a qualifying physical injury during his arrest. ORS

124.100(2) provides a cause of action for any vulnerable person who suffers an injury caused by

physical abuse. The parties do not dispute that Eamonn qualifies as a vulnerable person. Relevant

here, physical abuse is defined as an act that constitutes criminal assault. ORS 124.105(1)(a). A

person commits assault in the fourth degree when he "intentionally, knowingly or recklessly

causes physical injury to another." ORS 163.160(1)(a). A "'physical injury' means impairment of physical condition or substantial pain." ORS 161.015(7).

"The phrase 'impairment of physical condition,' as used in ORS 161.015(7), means 'harm to the body that results in a reduction in one's ability to use the body or a bodily organ for less than a protracted period of time.'" *State v. Lewis*, 266 Or. App. 523, 525–26 (2014) (quoting *State v. Higgins*, 165 Or. App. 442, 446–47 (2000)). "That definition 'should be understood to include not only impairment of voluntary use of a body part, but also of the ordinary function of a body part.'" *Lewis*, 266 Or. App. at 526 (quoting *State v. Glazier*, 253 Or. App. 109, 113 (2012)).

> The Oregon Court of Appeals explains:
>
> Examples of injuries that can reasonably be considered impairments of a victim's physical condition include a half-inch gash in the back of the head, because it disrupted the skin's function of protecting the inner body from infection, *State v. Hart,* 222 Or.App. 285, 290–92, 193 P.3d 42 (2008); a "heavy scrape" on the back, approximately one and one-half inches wide and four inches long, *State v. Jones,* 229 Or.App. 734, 738–39, 212 P.3d 1292, *rev. den.,* 347 Or. 446, 223 P.3d 1054 (2009); and injuries to the ribs and legs that made it more difficult for the victim to engage in normal activities such as walking up and down stairs and lifting small objects, *Glazier,* 253 Or.App. at 112–13, 288 P.3d 1007.
>
> In contrast, injuries that are not considered impairments of a victim's physical condition include a "slight" scratch on the cheek that the victim did not notice, was not painful, and was not noticeable after two to three days, *State v. Rice,* 48 Or.App. 115, 118, 616 P.2d 538, *rev. den.,* 289 Or. 741 (1980); scratches and scrapes on the neck and arm that went unnoticed by the victim, were not painful, and did not result in the reduction of the victim's ability to use the body or a bodily organ for any period of time, *Higgins,* 165 Or.App. at 447, 998 P.2d 222; and a bruise on a 16–month–old child's buttock that did not seem painful and did not diminish the child's bodily movement or ability to engage in everyday activities, *State v. Wright,* 253 Or.App. 401, 405–06, 290 P.3d 824 (2012).

*Lewis*, 266 Or. App. at 526.

Here, Defendants argue that Plaintiff's claim for abuse of a vulnerable person fails because there is no evidence from which a jury could conclude that Eamonn suffered a qualifying physical injury sufficient for conviction of assault in the fourth degree. For example,

Eamonn's injury did not require medical treatment, he did not complain of any pain, and when admitted to emergency psychiatric care after two days in jail, his medical record indicates that he had "no complaints of pain anywhere" but "[n]oteably, he d[id] have an abrasion across his forehead and two punctate areas across his right chest that is consistent with him being tasered." Morrow Decl. Ex. 13, ECF No. 53-13. However, the record contains other evidence from which a reasonable jury could conclude that Eamonn experienced substantial pain or impairment of physical condition. For example, the video evidence shows that several officers held Eamonn down on the couch while Potter and Wright punched Eamonn in the head and body causing Eamonn's blood to splatter on a couch cushion. Albies Decl. Ex. 9, ECF No. 62-8. An image of Eamonn captured shortly after the arrest shows blood on his forehead and nose. Albies Decl. Ex. 8, ECF No. 62-7. Eamonn's statement immediately following his arrest that "I'm not hurt" is not determinative where, as here, he was in the midst of a mental health crisis and, as Defendants contend, Eamonn "did not respond with any coherence" to the officers' other questions during this same period of time. Defs.' Mot. at 6. Eamonn's statement that he was not in pain while admitted into emergency psychiatric care is not determinative given his psychological condition at the time. Material issues of disputed fact preclude summary judgment on whether Eamonn's injuries caused an impairment of physical condition or substantial pain.

### C.    Coexistence of Negligence and Excessive Force

Defendants argue that summary judgment should be granted in their favor on Plaintiff's negligence claim because a claim for negligence cannot be based on the same facts as a claim for excessive use of force. Defendants explain that "it makes no sense to say that officers intentionally, but negligently, applied force." Defs.' Reply at 20. Plaintiff's negligence claim, however, seeks to hold the City liable for conduct broader than the officers' use of force. Compl. ¶ 65 (alleging inadequate training, supervision, review, or discipline of EPD officers). For

example, a jury could find that Wright's decision to immediately abandon the plan to communicate with Eamonn by phone and to enter the house with weapons drawn unreasonably created a substantial risk of serious harm. A jury could also find that it was negligent to grab Eamonn without warning when he was seated on the couch, that it was negligent for the officers to keep Eamonn hogtied for questioning and then to carry him to a police vehicle or that it was negligent to transport him to jail instead of to a hospital. Plaintiff's negligence claim against the City is distinct from the allegations regarding the officers' use of force and is not displaced.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED in part and DENIED in part. The Court grants summary judgment in favor of Defendants on Plaintiff's § 1983 claims. Summary judgment is denied on all other claims.

DATED this <u>30th</u> day of May 2025.


<u>s/ Mustafa T. Kasubhai</u>
MUSTAFA T. KASUBHAI (He / Him)
United States District Judge